*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 21-CV-0690

NIZAR ZAKKA, APPELLANT,

V.

PALLADIUM INTERNATIONAL, LLC and EDWARD ABEL, APPELLEES.

Appeal from the Superior Court
of the District of Columbia
(2020-CA-004591-B)

(Hon. Florence Y. Pan, Trial Judge)

(Argued October 20, 2022                    Decided July 27, 2023)

*Adam H. Farra*, with whom *Richard Leveridge* and *Rachel Jennings* were on the brief, for appellant.

*Benjamin S. Boyd*, with whom *Mary E. Gately*, *Paul D. Schmitt*, and *Sean Croft* were on the brief, for appellees.

*John Paul Schnapper-Casteras* filed a brief on behalf of law professors *Danielle Keats Citron*, *Kate Sablosky Elengold*, *Jonathan Glater*, *Andrew Hessick*, and *David Rubenstein* as *amicus curiae* in support of appellant.

Before DEAHL and ALIKHAN, *Associate Judges*, and GLICKMAN,[*] *Senior Judge*.

_____

[*] Judge Glickman was an Associate Judge at the time of argument.

GLICKMAN, *Senior Judge*:  In connection with an economic and civil society development project funded by the U.S. State Department and managed by appellee Palladium International, LLC, appellant Nizar Zakka traveled to Iran in September 2015 to attend a conference.  At the end of his planned visit, as he was on his way to the Tehran airport to fly home, Zakka was seized and detained.  He spent the next four years in an Iranian prison.  After he regained his freedom, Zakka sued Palladium and Edward Abel, the president of Palladium's U.S. business unit, in the District of Columbia Superior Court.  Zakka's complaint asserted causes of action for negligence and intentional infliction of emotional distress.  These claims were based on allegations that Palladium failed to warn Zakka of the "acute, peculiar, and unreasonable risks" he ran in going to Iran due to his association with Palladium, and that Palladium failed to take reasonable and foreseeably necessary precautionary measures to protect Zakka from those risks.

Appellees moved to dismiss the complaint for lack of subject matter jurisdiction pursuant to Superior Court Civil Rule 12(b)(1).  They asserted that, under a line of cases stemming from the Supreme Court's decision in *Yearsley v. W.A. Ross Construction Company*,[1] they were entitled to derivative sovereign

---

[1] 309 U.S. 18 (1940).

immunity from suit because the complaint was based on conduct authorized by the United States pursuant to the State Department's agreement with Palladium. The Superior Court granted the motion to dismiss for lack of subject matter jurisdiction on this ground. In the alternative, the judge concluded that if derivative sovereign immunity is not jurisdictional in nature, but rather is simply an affirmative defense to liability, appellees were entitled to summary judgment based on that defense.

On appeal, Zakka argues that the judge erred in each of those rulings. First, he contends that *Yearsley* immunity is not jurisdictional. We agree with him; the derivative immunity is a qualified immunity that does not deprive the court of subject matter jurisdiction, but only furnishes the defendant with an affirmative defense. Second, Zakka argues that the judge misapplied the *Yearsley* defense in granting summary judgment to appellees. We agree with him on that, too; appellees were not entitled to summary judgment because they did not demonstrate the absence of a material dispute of fact as to whether the State Department had authorized and directed Palladium to commit the allegedly tortious conduct at issue in this case. We therefore vacate the judgment and remand for further proceedings.

## I. Factual Background

The trial court's rulings are predicated on the following facts, which we take to be undisputed for present purposes unless we indicate otherwise. In 2015, the U.S. State Department granted an unsolicited application by Palladium (then known as Futures Group International, LLC) for a federal financial assistance award. This award, as set forth in a Cooperative Agreement between Palladium and the State Department, provided federal funding for Palladium to support the "Women's Alliance for Virtual Exchange (WAVE II)" network in Iran. The stated objectives of this eight-month project were to "engage Iranian women's CSOs [civil society organizations] in using ICT [information and communications technology] as a tool to develop their organizations, build alliances with international and regional organizations, and have their voices heard." According to the Cooperative Agreement, Palladium would undertake to achieve these objectives through online and third-country training (i.e., through activities conducted outside of Iran), and by service contracts with Iranian and regional civil society organizations for initiatives carried out inside Iran and elsewhere in the region.

Palladium explained to the State Department in its application for the WAVE II project award that its own staff would be unable to travel to Iran to observe

activities there "[d]ue to access and security considerations" and "the sensitive nature of the project." Palladium would need to "maintain a low profile" so that "Iranian beneficiaries [would not be] put at additional risk due to being identified as recipients of U.S. government funding." Consequently, any "project-supported activities in Iran" and any "[c]ommunication with Iranian beneficiaries" had to be "solely" through Palladium's regional partners, without disclosure of Palladium's own involvement, in order to "maintain the safety of the beneficiaries and program staff." Palladium also stated in its application that it would "produce a comprehensive set of Security Standard Operating Procedures" for the project that "could include" such measures as "security training and regular briefings for all staff," "[e]ffective transport and movement plans," "[p]ersonal and accommodation security measures," and "[a] robust crisis management plan including appropriate response options."

Palladium advised the State Department that one of the regional partners it would rely on to implement the Cooperative Agreement would be IJMA3, "a well-established regional ICT association with networks across the Arab world, Iran and the United States." IJMA3 would "take the lead in all WAVE Alliance building and IT-related activities" and "all in-country coordination" under the daily guidance of Palladium's WAVE Program Director. Appellant Zakka was a founding member

and senior official of IJMA3, and the chief executive officer of its sister organization, IJMA3-USA. IJMA3 and Zakka previously had provided assistance to the Women's Alliance for Virtual Exchange under an agreement between the State Department and a former State Department grantee.

The State Department's Cooperative Agreement with Palladium included provisions relating to Palladium's budgetary, reporting, and pre-approval obligations, to ensure that federal funds were used only for authorized activities, and to enable the State Department to monitor and evaluate Palladium's performance. The agreement stated that "[t]he Department of State's involvement in the operation of this project is considered to be substantial" and called for the State Department's "concurrence with" Palladium's Work Plans and "prior approval by the Grants Officer of all travel details (destination, number of participants, number of trips)." Palladium was required to "consult with the Grants Officer to ensure that all proposed travel is documented accordingly and that sufficient funds exist in the budget for such activities." However, among other limitations, the agreement specified that State Department representatives did not have the authority to "interfere[] with [Palladium]'s right to perform the terms and conditions of the award" or supervise Palladium's employees. Acknowledging the security concerns associated with the project, the agreement stated in general terms that Palladium

would "keep a strict communication protocol," that "[v]etting is obligatory for anyone who takes part in this project," that access to project documents would be restricted, and that Palladium would "work closely with" the State Department and the Grants Officer Representative "regarding any project concerns whether programmatic or security related." However, the agreement did not require Palladium to implement or follow any particular security procedures for safe travel to Iran, to provide any warnings in connection with anticipated travel to Iran, or to obtain State Department approval of its arrangements for the safety and security of travel-related activities.

The Work Plan that Palladium submitted to the State Department after being awarded funding for the WAVE II project included a tentative calendar of events. Among the planned activities, the Plan listed a women's group conference scheduled to take place in Iran in September 2015. Palladium proposed to send attendees to that conference to participate in "events to sustain the WAVE alliance." Palladium's Work Plan did not address travel safety or security arrangements. On June 1, 2015, the State Department approved the proposed Work Plan without any changes and without addressing any security matters. Three months later, on August 31, 2015, Palladium's WAVE Program Director Nadia Alami sent an email to the Grants Officer Representative requesting "travel and country clearance" for Zakka and

other IJMA3 personnel to attend the conference, which would be held in Tehran from September 15-18. This request also did not address any matters of safety or security.

The Grants Officer Representative, Shervin Hadjilou, responded with an unclassified email approving the travel request. The email stated:

> Regarding the travel request referenced in the email below, travel authorization is granted for the individuals below with the understanding that they will be traveling with documents issued by their respective governments, and none of which are US. Please note that this travel authorization is issued for Palladium in accordance with the provisions of award. Authorization by US government personnel for travel does not supersede travel warnings issued by the USG for the destination country. US government travel warnings can be found at http://www.state.gov/travel/.
>
> This travel is not required under the terms of the project, but is undertaken at the organization's and traveler's own risk.

This approval allowed Palladium to use federal funds awarded for the WAVE II project to send Zakka and the other identified individuals to the conference in

Tehran.[2]  So far as appears, no representative of the State Department discussed security arrangements for the travel to Tehran with Palladium.

After the conference ended on September 18, Zakka took a taxi to the Tehran airport to fly home.  While en route, the taxi was stopped by two unmarked vehicles.  Unidentified men (allegedly, members of the Iranian Revolutionary Guard Corps) emerged from the vehicles, pulled Zakka from his taxi, blindfolded him, and abducted him.  The men took Zakka to Evin prison in Tehran, where he was held,

---

[2] Nadia Alami, Palladium's WAVE Program Director, submitted a declaration under penalty of perjury in the Superior Court proceedings on Palladium's motions.  In it she averred that she and Zakka also "had conversations with Ms. Hadjilou about the proposed travel" to the September conference, in which Ms. Hadjilou similarly advised them "that the travel to Iran was ultimately the implementer's [i.e., Palladium's] choice and that Palladium would be undertaking the travel at its own risk."  Alami explained in her declaration that Palladium needed the State Department's approval of the travel only in order to use federal funds.

Zakka also submitted a declaration under penalty of perjury in connection with Palladium's motions.  He, too, averred that in meetings he attended with State Department officials (including Ms. Hadjilou and her superiors), and in follow-up conversations with them, they had said that travel to Iran was not a requirement of the WAVE II program, and that "it was ultimately Palladium's decision" whether to engage in such travel.  In Zakka's experience, the State Department's "clearance" and authorization merely meant that the travel to Iran would not violate U.S. government policy and that Palladium could use federal funds (granted under the federal assistance award) to pay for it.

Alami's and Zakka's averments appear not to have been disputed in the proceedings below.

largely incommunicado, for the next four years. During that time, Zakka endured brutal conditions and long periods of solitary confinement. He was routinely beaten, starved, tortured, and threatened with imminent execution. His health deteriorated drastically. And he was subjected to prolonged and repeated interrogations regarding his work with Palladium and its supposed activities on behalf of Iran's enemies to subvert the Iranian government and meddle in Iran's internal affairs. Eventually, Zakka was put on trial and convicted of spying, cooperating with an enemy government, and other crimes supposedly related to his involvement with Palladium.

Zakka was released from prison and allowed to leave Iran in June 2019. By then, he was an ill and broken man.

In his lawsuit against Palladium and Abel, Zakka claims that they knew but failed to warn him that his trip to Tehran would expose him to heightened and unique risks (including the risks of abduction and imprisonment) due to his association with Palladium, and that they knowingly failed to take reasonable and customary precautions and measures to protect him from those risks. Specifically, Zakka's complaint alleges that "Palladium knew but did not disclose that the Iran program could be perceived (incorrectly) by certain elements within the Iranian government

as a pretextual effort to subvert the Iranian political order, and that anyone associated with such an effort could therefore be targeted for wrongful imprisonment and other forms of retaliation." Palladium also allegedly knew but did not disclose that this risk was "more acute" because "certain hardline elements within the Iranian government viewed Palladium as a proxy of Iran's adversaries (the United States, the Arab Gulf States)" and therefore would treat persons associated with the WAVE II project as "agents of those adversaries." While Palladium's application for the WAVE II project award had acknowledged the security risks to the State Department, it allegedly provided Zakka "with no security training, no security detail, no driver in Iran, no meaningful security protocol, and no precautions at all to protect" him.[3]

## II. The Proceedings on Appellees' Motion to Dismiss

Palladium and Abel moved to dismiss the complaint on several grounds, only one of which is before us now. Appellees argued that they were entitled to invoke

---

[3] In the declaration he submitted in the proceedings below, Zakka further averred that Palladium had not implemented any of the security measures it said in its application that it "could" adopt. This averment appears to be uncontradicted in the record as it presently stands.

the United States government's sovereign immunity from suit based on the Supreme Court's holding in *Yearsley v. W.A. Ross Construction Company*.[4]  As we discuss more fully below, *Yearsley* involved a private lawsuit against a government contractor for property damage from construction work that the government had validly authorized and directed the contractor to perform.  Under those circumstances, the Court held, "there is no liability on the part of the contractor for executing [the government's] will."[5]  Palladium and Abel argued that they could not be held liable to Zakka for their actions in sending him to Iran because they too were acting pursuant to valid governmental authorization and carrying out the government's will in doing so.

At a hearing on the motion to dismiss, the judge decided to focus on appellees' *Yearsley* claim.  The judge said that "the derivative sovereign immunity issue is narrow and it could be dispositive," so it would potentially be an "efficient" way to resolve the motion to dismiss in view of the complexity of the other grounds presented.  In the colloquy that ensued, however, the parties disagreed over whether *Yearsley* applied in the circumstances of the present case.  The judge eventually

---

[4] 309 U.S. 18 (1940).

[5] *See id.* at 20-21.

expressed the view "that as long as the work done by the government contractor was done with the authorization of the government, the approval of the government, and within the scope of the contract," the contractor "would be entitled to" immunity. Therefore, the judge reasoned, if "this particular trip was authorized by the Grants Officer as the contract directs, then derivative sovereign immunity would apply . . . . because the contract specifically says that the State Department has to approve all of the travel details." That would be the result, the judge said, even if the authorization "doesn't talk about how [Palladium is] going to address security."

The judge thereupon held the motion to dismiss in abeyance and ordered the parties to conduct targeted discovery to determine whether the State Department had authorized Zakka's trip to Tehran.[6] The judge also set a schedule for the parties to submit supplemental briefing on the immunity issue.

---

[6] In the discovery process that then occurred, Zakka believed that appellees' document production was deficient. After the parties conferred and did not resolve the issue, Zakka moved to compel production of documents relating to (1) security procedures referenced in Palladium's original application for funding for the WAVE II project, and (2) Palladium's communications with the State Department after Zakka's abduction. The court eventually denied this motion, as well as a subsequent request by Zakka to take additional discovery. Zakka has appealed these rulings, but given the view we take of his appeal on the merits, we find it unnecessary to address them. The litigation will proceed and discovery will resume.

In their supplemental briefs, the parties disagreed as to the proper procedure for reviewing the motion to dismiss. Zakka asked the court to convert the motion to one for summary judgment, with review governed by Superior Court Civil Rule 56, given the parties' reliance on evidence outside the pleadings for the court's consideration. Palladium and Abel took the position that the court should review the motion pursuant to Superior Court Civil Rule 12(b)(1) because the derivative immunity they asserted was a "jurisdictional defense."

On September 15, 2021, the judge held a second hearing, heard argument, and ruled from the bench. She identified the immunity issue as turning on "whether the travel by Mr. Zakka to Iran was authorized by the State Department." (Zakka's attorney noted his continuing disagreement with the court's narrow "framing of the issue.")

The judge said the issue presented "more of a 12(b)(1) case . . . because it is a claim about the jurisdiction of the [c]ourt, and an assertion of immunity has been viewed in that way." She then discussed the evidence submitted by the parties, including the WAVE II project documents, the email between Palladium and the State Department about the trip to Iran, and the declarations of Zakka and Alami. The judge decided not to "credit" the statements in those declarations that (the judge

perceived) "contradict the hard evidence, [such as] the email that says 'Travel approval request, authorization granted.'" The judge concluded that the WAVE II "proposal and the agreement contemplate[] that IJMA3 staff, including Mr. Zakka, would travel to Iran." She noted that the WAVE II Work Plan "also specifically refers to this September 15th sustainability event in Iran and it says that the regional partner will implement it, referring to IJMA3." In addition, the judge said, the Cooperative Agreement "required that all travel be approved by the State Department," and the email exchange in which Palladium sought and obtained that approval was "done in order to comply with" that agreement. The judge found that the State Department's email authorized the travel; and based on the "specific statement that the travel is taken at the organization's [and] the traveler's own risk," the judge also found that "the failure to specify additional security was authorized by the State Department" too. In sum, the judge concluded, "based on the record that's before this [c]ourt, his travel plans, including the lack of security or specified security arrangements[,] were authorized by the State Department, and therefore . . . Palladium is entitled to invoke Derivative Sovereign Immunity."

The judge said she was "inclined" to dismiss the case under Rule 12(b)(1), but that even viewing the motion as one for summary judgment, she would grant it because there was no evidence "sufficient to create a material issue of fact to

contradict the very plain language in a binding contract and a legally significant email which was required under the contract for authorization."

### III. Discussion

We proceed as follows. First, we discuss the origin and requirements of the doctrine that is commonly referred to as "derivative sovereign immunity." We next examine whether a claim of this derivative immunity presents a question of the court's subject matter jurisdiction, or instead asserts an affirmative defense. Lastly, we address whether appellees established that their claim of derivative sovereign immunity entitled them to relief.

### A. Derivative Sovereign Immunity

The United States government itself is immune from suit in the courts of this country except when, and to the extent that, it has expressly waived its common law sovereign immunity and consented to be sued.[7] It is not contended, and it does not

---

[7] *See, e.g.*, *United States v. Mitchell*, 463 U.S. 206, 212 (1983) ("It is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction."); *Stevens v. ARCO Mgmt. of Wash. D.C., Inc.*, 751 A.2d 995, 999 (D.C. 2000) (collecting cases).

appear, that the government has consented to be sued for the torts asserted in Zakka's complaint. Although the United States has waived its sovereign immunity from certain types of tort claims in the Federal Tort Claims Act (FTCA),[8] at least two express exceptions to that waiver — the discretionary function exception and the arising-in-a-foreign-country exception — appear to preserve the government's immunity from suit for the State Department's approval of Palladium's proposal to send him to Iran in connection with the WAVE II project.[9]

---

[8] *See* 28 U.S.C. §§ 1346(b)(1), 2674.

[9] Appellees assert that sovereign immunity would apply under the "discretionary function" exception to the government's waiver of immunity from suit, *see id.* § 2680(a), because the State Department's decisions about travel and safety requirements for international programs, including its supervision over the implementation of those requirements, were inherently discretionary decisions that reflected policy judgments. *See, e.g.*, *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 819-20 (1984) (holding that "the extent to which [an agency] will supervise the safety procedures of private individuals" using a government program, and the "policy judgments" made in designing that program, constitute discretionary functions under § 2680(a)). In addition, the exception for "[a]ny claim arising in a foreign country," 28 U.S.C. § 2680(k), applies to claims, like those asserted by Zakka here, where the "injury or harm occur[red] in a foreign country." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 704 (2004).

The FTCA excludes independent contractors from its coverage.[10]  Appellees argue, however, that, under the federal common law concept of "derivative sovereign immunity" for agents of the government, their immunity from suit shields appellees from suit in the present case as well.

The concept of "derivative sovereign immunity" originated in *Yearsley*, though that case did not use the term or base its ruling on the sovereign immunity of the United States.[11]  In *Yearsley*, landowners sued a construction company for the erosion of 95 acres of their property caused by dikes that the company had built on the Missouri River pursuant to a federal government contract to improve navigation.[12]  The contractor's work "was all authorized and directed by the government of the United States" pursuant to an Act of Congress.[13]  The Court held that where the government's "authority to carry out the project was validly conferred, that is, if what was done was within the constitutional power of Congress,

---

[10] *See* 28 U.S.C. § 2671.

[11] In fact, the Court assumed that the United States might be liable to pay compensation to the plaintiffs under the Takings Clause of the Fifth Amendment.

[12] *Yearsley v. W.A. Ross Constr. Co.*, 309 U.S. 18, 19-20 (1940).

[13] *Id.* at 20.

[then] there is no liability on the part of the contractor for executing its will."[14]  In other words, as the Supreme Court subsequently described the holding of *Yearsley*, a validly authorized government contractor "who simply performed as the Government directed" is immune from suit for the consequences of such performance.[15]

This so-called "derivative" immunity, "unlike the sovereign's, is not absolute."[16]  "It applies only when a contractor takes actions that are 'authorized and directed by the Government of the United States,' and 'performed pursuant to the Act of Congress' authorizing the agency's activity."[17]  Thus, "the contractor must adhere to the government's instructions to enjoy derivative sovereign immunity;

---

[14] *Id.* at 20-21.

[15] *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 167 (2016); *see also id.* at 166 (holding that government contractor in that case was not entitled to *Yearsley* immunity because it had "violate[d] both federal law and the Government's explicit instructions").

[16] *Id.* at 166.

[17] *Am. Fed'n of Gov't Emps. v. Off. of Pers. Mgmt. (In re U.S. Off. of Pers. Mgmt. Data Sec. Breach Litig.)*, 928 F.3d 42, 69 (D.C. Cir. 2019) (quoting *Campbell-Ewald*, 577 U.S. at 167).  "After all, the driving purpose of derivative sovereign immunity is to prevent the contractor from being held liable when the government is actually at fault but is otherwise immune from liability."  *Id.* at 70 (internal quotation marks omitted).

staying within the thematic umbrella of the work that the government authorized is not enough to render the contractor's activities" immune from suit.[18]  Similarly, where the government does not "dictate[] exactly" how the contractor is to carry out its tasks or substantially constrain the contractor's exercise of discretion in performing its authorized responsibilities, the contractor generally is not immune from suit for how it exercises that discretion.[19]  As the First Circuit has explained, although *Campbell-Ewald Co. v. Gomez* held derivative sovereign immunity

---

[18] *Metzgar v. KBR, Inc. (In re KBR, Inc., Burn Pit Litig.)*, 744 F.3d 326, 345 (4th Cir. 2014).

[19] *Id.* at 346; *see also Posada v. Cultural Care, Inc.*, 66 F.4th 348, 358 (1st Cir. 2023) ("[W]hile *Yearsley* recognizes that an 'agent or officer' may enjoy protection from liability when 'authorized and directed' by the Government to take the action for which it is alleged to be liable, *Yearsley* does not hold that an 'agent or officer' necessarily also enjoys protection from liability for *not* taking other actions that the Government left it free to take while acting as it had been so 'authorized and directed.'"); *Cabalce v. Thomas E. Blanchard & Assocs. Inc.*, 797 F.3d 720, 732 (9th Cir. 2015) ("[D]erivative sovereign immunity, as discussed in *Yearsley*, is limited to cases in which a contractor 'had no discretion . . . and completely followed government specifications.' . . . 'Nothing in *Yearsley* extended immunity to . . . contractors exercising a discretionary governmental function.'" (alteration and citation omitted)); *cf. Taylor Energy Co., L.L.C. v. Luttrell*, 3 F.4th 172, 174, 176-77 (5th Cir. 2021) (applying derivative sovereign immunity where the government directed the contractor to design the project, approved the initial design and variations as it changed "throughout the life of the project," "routinely met" with the contractor, memorialized the meetings, including documenting when it approved and monitored the contractor's progress, and approved "next steps in the project" before they were taken).

unavailable in a case where the contractor actually had violated the government's explicit instructions,

> the Court at no point suggested that Government agents or officers are entitled to protection under *Yearsley* so long as they are not acting in violation of such instructions. . . . [A]ny such notion would be implausible, given that Government agents and officers may do all manner of things that are not in violation of any express instructions of the Government but that have in no sense been "authorized and directed" by the Government.[20]

Thus, "a contractor might avail itself of the government's derivative immunity only where it acts pursuant to specific directions from the government."[21]  *Yearsley* immunity covers "only those acts that agents of the government are expressly directed by the government to perform."[22]

This means that a contractor claiming *Yearsley* immunity from liability for a tortious act must establish that the government specifically authorized *and* directed it to perform the tortious act itself.  Mere governmental acceptance or approval of a

---

[20] *Posada*, 66 F.4th at 359 (citation omitted).

[21] *Broidy Cap. Mgmt. LLC v. Muzin*, 12 F.4th 789, 803 (D.C. Cir. 2021).

[22] *In re U.S. Off. of Pers. Mgmt. Data Sec. Breach Litig.*, 928 F.3d at 80 (Williams, J., concurring and dissenting in part).

tortious act will not suffice to vest a government contractor with derivative sovereign immunity if the government did not actually direct the contractor to commit the tort.[23] Nor does it suffice for a contractor to show only that the tortious act was within the scope of the activity that the government authorized and directed it to do. In *Cabalce v. Thomas E. Blanchard & Associates Inc.*, for example, the government had seized fireworks and contracted with a private company to destroy them.[24] Employees of the company were fatally injured while carrying out that assignment, and their family members sued the company under various tort theories.[25] The company's agreement with the government required all destruction of the fireworks to be "coordinated and approved" by the responsible government agency's

---

[23] *See, e.g.*, *McCue v. City of New York (In re World Trade Ctr. Disaster Site, Litig.)*, 521 F.3d 169, 197 (2d Cir. 2008) ("[I]f the government merely accepted, without substantive review or enforcement authority, decisions made by an entity, that entity would not be entitled to derivative discretionary function immunity. Furthermore, derivative immunity will not preclude recovery for injuries occasioned by violation of state statutes if the entity could have abided by those statutes while implementing the agency's specifications." (citation omitted)). The plaintiffs in *McCue* — construction workers, firefighters, police, and others present during the cleanup of the World Trade Center after the September 11, 2001, terrorist attacks — sued the government and its contractors for, among other things, respiratory injuries that they attributed to flawed respirator policies implemented by the contractors. If the government simply "rubber stamped" those policies, the Second Circuit said, the contractors "would not be entitled to derivative immunity." *Id.* at 198.

[24] 797 F.3d at 723.

[25] *Id.* at 724-25.

"designated representative."[26]   The record nonetheless lacked evidence of the government's "control or supervision over the handling of the seized fireworks" or its involvement "in developing the destruction plan itself."[27]   The Ninth Circuit concluded that without proof that the company carried out the destruction of the fireworks in accordance with specific instructions or supervision from the government, the company could not benefit from *Yearsley* immunity for its improper performance of the task.[28]

---

[26] *Id.* at 724.

[27] *Id.* at 728.

[28] *See id.* at 732; *see also, e.g., Broidy Cap. Mgmt. LLC v. Muzin*, 12 F.4th 789, 803 (D.C. Cir. 2021) (failure to show that the foreign government "specifically ordered" the defendants "to participate in a scheme to hack and distribute [the plaintiff]'s private emails" meant   derivative sovereign immunity analogous to *Yearsley* immunity would not be available); *Posada v. Cultural Care, Inc.*, 66 F. 4th 348, 361 (1st Cir. 2023) (rejecting the argument that the government's omission in the contractor's agreement of a reference to compliance with labor laws meant the government approved or directed noncompliance with those laws); *cf. Butters v. Vance Int'l, Inc.*, 225 F.3d 462, 466-67 (4th Cir. 2000) (concluding that where the contractor followed the foreign government's specific order not to promote a particular individual, the contractor was entitled to derivative sovereign immunity under the Foreign Sovereign Immunities Act).

## B. *Yearsley* Immunity Is an Affirmative Defense

Zakka argues that the Superior Court erred in treating the claim of *Yearsley* immunity as a question of subject matter jurisdiction. He asserts that the immunity is an affirmative defense. Appellees argue that the Superior Court was correct because this type of immunity is based on the sovereign's immunity from suit. Because sovereign immunity deprives the court of subject matter jurisdiction,[29] they contend that "derivative sovereign immunity" should be treated as jurisdictional too.

If *Yearsley* immunity deprives the court of subject matter jurisdiction, it may be asserted by a motion to dismiss the complaint pursuant to Superior Court Civil Rule 12(b)(1), and "the court may conduct an independent review of the evidence submitted by the parties, including affidavits, to resolve factual disputes concerning whether subject-matter jurisdiction exists."[30] If *Yearsley* immunity is not jurisdictional, however, it would be treated like other affirmative defenses to liability. In that case, the immunity claim could be asserted prior to trial by means of a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief

---

[29] *FDIC v. Meyer*, 510 U.S. 471, 475 (1994) ("Sovereign immunity is jurisdictional in nature.").

[30] *Matthews v. Automated Bus. Sys. & Servs., Inc.*, 558 A.2d 1175, 1179 (D.C. 1989).

can be granted, a Rule 12(c) motion for judgment on the pleadings, or a Rule 56 motion for summary judgment. But when presented with any of those pretrial motions, the court does not resolve disputed issues of fact. If the court cannot decide the motion as a matter of law on the pleadings and any facts not in dispute, it must leave any material disputed facts regarding the availability of an affirmative defense for resolution at trial.[31]

Whether *Yearsley* immunity is jurisdictional therefore affects our review on appeal. If the Superior Court properly upheld the claim of immunity under Rule 12(b)(1), we owe deference to its factual determinations supporting that decision.[32]

---

[31] *See, e.g.*, *Anderson v. Ford Motor Co.*, 682 A.2d 651, 654 (D.C. 1996) ("We cannot, nor can the trial court, 'resolve issues of fact or weigh evidence at the summary judgment stage.' 'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of [the] judge. . . . The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.'" (alteration in original) (citation omitted)).

[32] *See Monteilh v. AFSCME, AFL-CIO*, 982 A.2d 301, 302 (D.C. 2009) (explaining that while the "issue of subject matter jurisdiction is a question of law" subject to review de novo, if a "factual inquiry is necessary before the trial court may determine whether it has jurisdiction," this court reviews the factual determination for clear error).

But our review is less deferential if the question is whether the judge properly granted summary judgment to appellees.[33]

Neither *Yearsley* nor *Campbell-Ewald* explicitly decided whether derivative sovereign immunity is jurisdictional or an affirmative defense. It does not appear that this question of jurisdiction was posed in either of those cases. However, we think each decision strongly implied that the immunity is not jurisdictional in nature. In *Yearsley*, no question of jurisdiction was raised or discussed; the case came to the Court after a trial,[34] and the Court focused on the merits question of the contractor's liability. The *Yearsley* Court did not even mention sovereign immunity, let alone hold that such immunity from suit extended to a government contractor. In *Campbell-Ewald*, where the trial court had decided the claim of derivative immunity on summary judgment (and not as a question of subject matter jurisdiction), the Supreme Court flatly rejected "the notion that private persons performing

---

[33] *MobilizeGreen, Inc. v. Cmty. Found. for Cap. Region*, 267 A.3d 1019, 1024 (D.C. 2022) (reviewing the trial court's grant of summary judgment de novo, which includes "an independent review of the record").

[34] *W.A. Ross Constr. Co. v. Yearsley*, 103 F.2d 589, 590, 593 (8th Cir. 1939), *aff'd*, 309 U.S. 18 (1940).

Government work acquire the Government's embracive immunity."[35] The Court explicitly held that federal contractors do not "share the Government's unqualified immunity from liability and litigation."[36] It treated the claim of derivative sovereign immunity as a typical qualified immunity claim asserted as an affirmative defense, not as a basis for depriving the court of jurisdiction.[37] And the Court reviewed the *Yearsley* immunity issue under Civil Rule 56 standards, stating that "[a]t the pretrial stage of litigation, we construe the record in a light favorable to the party seeking to avoid summary disposition."[38] That the Court made no mention of any jurisdictional issue is "telling because [federal] courts, including the Supreme Court, 'have an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party.'"[39]

Most federal courts that have explicitly addressed the issue have concluded that *Yearsley* immunity does not relate to the court's subject matter jurisdiction, but

---

[35] *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 166 (2016).

[36] *Id.*

[37] *Id.* at 167-68.

[38] *Id.* at 168.

[39] *Spurlin v. Air & Liquid Sys. Corp.*, 568 F. Supp. 3d 1050, 1054 (S.D. Cal. 2021) (quoting *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006)).

rather is an affirmative defense.[40] The United States itself has consistently taken the same position in litigation.[41] We agree with the view that *Yearsley* immunity is best

[40] *See, e.g.*, *Ackerson v. Bean Dredging LLC*, 589 F.3d 196, 207 (5th Cir. 2009) (concluding *Yearsley* is not jurisdictional because it "does not discuss sovereign immunity or otherwise address the court's power to hear the case"); *Taylor Energy Co., L.L.C. v. Luttrell*, 3 F.4th 172, 175 (5th Cir. 2021) ("*Yearsley* immunity is an affirmative defense, and [the defendant] bore the burden of proof on the defense at trial."); *Adkisson v. Jacobs Eng'g Grp., Inc.*, 790 F.3d 641, 646-47 (6th Cir. 2015) (following the Fifth Circuit's reasoning and adding that *Yearsley* is "closer in nature to qualified immunity for private individuals under government contract, which is an issue to be reviewed on the merits rather than for jurisdiction"); *New York v. Pa. Higher Educ. Assistance Agency*, No. 19 CIV. 9155 (ER), 2020 U.S. Dist. LEXIS 77655, at *16-18 (S.D.N.Y. May 1, 2020) (recognizing the Second Circuit has not weighed in directly but that it "has treated the contractor defense outlined in *Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988), which also traces its origins to *Yearsley*, . . . as a defense on the merits, rather than a jurisdictional bar" and extending that conclusion to *Yearsley* immunity); *Harris v. Kellogg, Brown & Root Servs., Inc.*, No. CV 08-563, 2016 U.S. Dist. LEXIS 121859, at *2-3 (W.D. Pa. Sept. 9, 2016) (agreeing with courts holding that *Yearsley* is a defense and recognizing that its conclusion is "consistent with Third Circuit precedent" because "qualified immunity must be treated as an affirmative defense challenging the merits of the claim"); *Rouse v. BBC AF Mgmt./Dev., LLC*, No. CIV-21-326-F, 2022 U.S. Dist. LEXIS 103197, at *3 (W.D. Okla. June 9, 2022) (noting that the "Tenth Circuit has not decided whether *Yearsley* immunity is jurisdictional" but finding the Fifth and Sixth Circuits "more persuasive"). *But see Cunningham v. Gen. Dynamics Info. Tech., Inc.*, 888 F.3d 640, 650 (4th Cir. 2018) ("[T]he *Yearsley* doctrine operates as a jurisdictional bar to suit and not as a merits defense to liability.").

[41] *See, e.g.*, United States' Statement of Interest at 6, *Clover v. Camp Pendleton & Quantico Hous. LLC*, 525 F. Supp. 3d 1140 (S.D. Cal. 2021) (No. 20-cv-567-LAB-WVG) ("Defendants argue that they are entitled to dismissal under Fed. R. Civ. P. 12 (b)(1) because the Court lacks subject matter jurisdiction based on derivative sovereign immunity from litigation. Derivative sovereign immunity to litigation does not exist. Rather, Defendants at best could argue they are entitled to a privilege shielding them from liability under the factual circumstances of this case."); Brief for the United States as Amicus Curiae at 11, *CACI Premier Tech.,*

understood as an affirmative defense, not as a jurisdictional bar. Simply put, while *Yearsley* immunity may be referred to as "derivative" of sovereign immunity, it "does not confer sovereign immunity on contractors."[42] The immunity of the sovereign from suit is uniquely jurisdictional; it is grounded in the notion (and policy) that the sovereign is not subject at all to the authority of its courts without its consent. *Yearsley* immunity furnishes no such exemption; it does not deprive the courts of the power to decide any claims asserted against government contractors. Rather, *Yearsley* immunity merely provides government contractors with a legal justification, if they can establish its preconditions, for conduct that otherwise might subject them to civil liability in the courts. Specifically, as the Supreme Court has said, "[w]here the government has directed a contractor to do the very thing that is the subject of the claim, we have recognized this as a special circumstance where

*Inc. v. Al Shimari*, 141 S. Ct. 2850 (2021) (No. 19-648) ("[W]hen a government contractor acting as an agent of the government exercises a validly delegated privilege, the contractor is not immune from suit for unlawful conduct; rather, the contractor is protected from liability only to the extent—and only *because*—it is acting lawfully."); Brief for the United States as Amicus Curiae at 7, *Posada v. Cultural Care, Inc.*, 66 F.4th 348 (1st Cir. 2023) (No. 21-1676) ("[T]he *Yearsley* doctrine affords private entities the opportunity to show that they cannot be held liable because they lawfully exercised lawfully delegated authority.").

[42] *United States ex rel. Ali v. Daniel, Mann, Johnson & Mendenhall*, 355 F.3d 1140, 1146-47 (9th Cir. 2004).

the contractor *may assert a defense*."[43]   Thus, like other qualified immunities, *Yearsley* immunity is not a limitation on the court's subject matter jurisdiction; it is "an affirmative defense that must be pleaded by a defendant"[44] and supported by the record before the court.

## C. Appellees Were Not Entitled to *Yearsley* Immunity

Since *Yearsley* immunity is an affirmative defense, it was appropriate for the Superior Court to consider appellees' motion, in the alternative, under Rule 12(b)(6) rather than Rule 12(b)(1) and, because the court considered matters outside of the pleadings, to convert the motion to one for summary judgment.[45]   "This court reviews a trial court's grant of a motion for summary judgment de novo."[46]   In doing so, we may not defer to the Superior Court's view of the evidence.  Rather, as the

---

[43] *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 74 n.6 (2001) (emphasis added).

[44] *See Harlow v. Fitzgerald*, 457 U.S. 800, 815 (1982); *see also Nevada v. Hicks*, 533 U.S. 353, 373 (2001) ("Without so much as a citation (none is available) the concurrence declares the qualified immunity inquiry to be part of the jurisdictional inquiry, thus bringing it within the ken of the federal court at the outset of the case. . . .  There is no authority whatever for the proposition that absolute- and qualified-immunity defenses pertain to the court's jurisdiction . . . .").

[45] *See* Super. Ct. Civ. R. 12(d).

[46] *Thurman v. District of Columbia*, 282 A.3d 564, 572 (D.C. 2022).

Supreme Court said in *Campbell-Ewald*, we must "construe the record in a light favorable to the party seeking to avoid summary disposition."[47]  Summary judgment is proper if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[48]

As we have said, a defendant claiming *Yearsley* immunity must establish that the government validly authorized and directed the allegedly tortious conduct at issue.  It is not enough for the defendant merely to show that the conduct did not violate the government's instructions and was undertaken as part of a government-approved program.  The immunity issue in this case therefore boils down to whether appellees have demonstrated there were no genuine factual disputes about whether the State Department authorized and directed Palladium to send Zakka to Iran as part of the WAVE II project, and whether it authorized and directed Palladium to do so without warning him of the risks to his safety or taking appropriate precautions and measures to protect him on the trip.

---

[47] *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 168 (2016).

[48] Super. Ct. Civ. R. 56(a)(1).

At the outset, we note that the Superior Court made no finding that the State Department *directed* Palladium to do any of those things. The court found it undisputed that the State Department *authorized* Palladium to proceed with the planned travel at government expense pursuant to the Cooperation Agreement.[49] But the court did not find that the State Department *directed* Palladium to go ahead with that travel. In addition, the court made no finding that the State Department authorized Palladium to proceed without warning Zakka of the danger he would be in if he traveled to Iran under Palladium's (undisclosed) auspices.[50]

The procedural evolution of this case curtailed the development of the factual record, and we recognize that further discovery and factual development on remand may lead to a different understanding of the material facts. On the existing record, however, we conclude that facts material to the claim of *Yearsley* immunity and the

---

[49] As to the *validity* of that authorization, Zakka does not dispute that Congress had constitutionally conferred on the State Department the authority to carry out the WAVE II project through grantees like Palladium, or that the State Department lawfully could have authorized the travel to Iran for the purposes identified by Palladium as part of that project.

[50] As to the court's finding that the State Department knowingly approved the proposed travel despite "the lack of security or specified security arrangements," we conclude that finding lacks support in the record, as we explain below.

reasonable inferences that could be drawn from those facts are indeed genuinely disputed, meaning appellees were not entitled to summary judgment on their derivative immunity defense. First, there was uncontradicted evidence that the State Department *did not* direct Palladium to proceed with the proposed travel to Iran for the September conference in Tehran. In response to Palladium's request for approval of the travel, the State Department informed Palladium that "[t]his travel is *not required* under the terms of the project, but is *undertaken at the organization's and traveler's own risk*." That is not a directive from the State Department to proceed; it is an unambiguous disavowal of such a directive. That the State Department *allowed* Palladium to go ahead with the travel at government expense does not mean it *instructed* Palladium to do so. In fact, we can say on the record as it now stands that the State Department clearly did not so instruct.

Second, there was no evidence in the record that the State Department authorized or directed Palladium to proceed without warning Zakka of the danger. So far as appears, the subject of warnings was never mentioned in any exchange between Palladium and the State Department. Appellees have not claimed that they warned Zakka of the risks, and they have not claimed that their failure to do so was ever authorized or directed by the State Department.

Third, we perceive no evidence in the record that the State Department approved Palladium's lack of security arrangements for the planned travel to Iran. Although the Cooperation Agreement provided for "substantial" involvement by the State Department, that involvement did not — so far as appears — extend to any discussion or review, let alone requirements or approval, of the procedures Palladium would follow to protect persons traveling to Iran. The Cooperation Agreement is virtually silent on the subject; Palladium's Work Plan and travel request did not mention it; and the State Department declined to weigh in on the question of security, pointedly telling Palladium only that the proposed travel would be undertaken at Palladium's and the traveler's "own risk." The record is devoid of any significant exchange between Palladium and the State Department regarding the security arrangements that Palladium would make; so far as appears, those arrangements were left to Palladium's sole discretion — which means Palladium is not entitled to derivative sovereign immunity for their absence or insufficiency.

The Superior Court judge reasoned that because the State Department approved Palladium's travel request, it implicitly approved "the failure to specify additional security," and that this meant the State Department authorized "the lack of security or specified security arrangements." With respect, we think this logic tenuous. The record does not establish that the State Department even took notice

of Palladium's "failure to specify" its security arrangements, or if it did, that the State Department realized no arrangements had been or would be made. So far as appears, the State Department asked no questions and obtained no information about security for the proposed travel. If any inference can be drawn from the apparent lack of communication on the subject, it is that the State Department either was oblivious to the question or assumed Palladium was making appropriate security arrangements (as Palladium had assured the State Department it would do, in its application for the WAVE II project grant) and was satisfied to leave the matter to Palladium's discretion. This cannot be construed as governmental authorization of a lack of such arrangements.[51]

## IV. Conclusion

For the foregoing reasons, appellees were not entitled to summary judgment based on their claim of derivative sovereign immunity. We reverse the judgment of the Superior Court and remand for further proceedings consistent with this opinion.

---

[51] *See In re U.S. Off. of Pers. Mgmt. Data Sec. Breach Litig.*, 928 F.3d 42, 70 (D.C. Cir. 2019) (concluding that the "sovereign immunity well from which [the contractor] seeks to draw has run dry" because of its "inability to point to a contractual provision or other [government] direction authorizing or directing the very gaps in security protections over which [plaintiffs] are suing").